Before we hear oral argument in Brand X Internet v. FCC, Judge Thomas and I would like to express our appreciation to Judge Cudahy who has joined us from the Seventh Circuit Court of Appeals to help us on cases this week. We appreciate your willingness to do so, Judge Cudahy. I understand that counsel has agreed to an allocation of time, at least this affects only one side of the room. I guess FCC has the entire 35 minutes to itself, but the petitioners have allocated their time and they have secured an agreement with our deputy clerk who is very generous in agreeing to keep separate clocks on each of your individual presentations. So we will start first with Mr. Reiter. Thank you, Your Honor. May it please the Court, I will be arguing for Brand X Internet services on the issue of stardecisis. The FCC's declaratory ruling that cable modem service is a regulation-free information service conflicts directly with this Court's holding in AT&T v. City of Portland that the transmission component of cable modem service is a telecommunication service subject to commentarial regulation under the Communications Act. I would like to discuss why the Portland decision binds the litigants in this case under principles of stardecisis and how the Portland decision also speaks indirectly to the question of remedy. The Commission and Brand X are in full agreement about several points. The Court's decision in Portland did not constitute a deferential review of an agency decision. In fact, the Commission expressly declined to offer its views on the meaning of the Communications Act in the Portland decision. And that has dispositive consequences for another reason, because both the petitioner, Brand X, and the Commissioner are in agreement that under this Court's decision in May's severity, unless the Court determines the meaning of a statute, that meaning binds it against subsequent interpretations by an administrative agency unless, and this is an exception that doesn't apply here, unless the Court's decision itself constituted only a deferential review of an earlier decision by the agency. If there were any ambiguity at all on this score, I think the case of Neal v. United States resolves it completely, a case which the Commission neither acknowledges nor attempts to distinguish in its briefs. I mentioned that the Court's decision in Portland also speaks indirectly to the question of remedy. I'll defer you to that. From the standpoint of the FCC, of course, they had the Portland case in this rule and proceeded, but chose not to follow it. Was that contemptible, or how should one address the actions of the FCC? I'm very much aware that in the tax context, the Commissioner will often identify certain cases that the Commissioner will not acquiesce in. In fact, they routinely publish such a list saying that these are the cases which come from different circuits but which do not necessarily bind the Commissioner. How do you approach that here? Well, certainly, and Mr. Butler will address this, why the agency's decision itself, while not contemptible, certainly didn't really offer a reasoned explanation for its interpretation of the statute and why this Court was right in the first place. So whether it was free to offer its views, the consequences are that on review by this Court, it's bound. Both the agency and the other litigants in this Court are bound by the Court's precedent in Portland. In other words, we're bound, but the FCC may not be bound. Well, no, the agency is certainly bound. Whether it was free to offer its erroneous view, it did that. But I mentioned also that in the city of Portland, this Court made a couple of observations. It pointed out that its interpretation of the statute was consistent with Congressional intent to prioritize consumer choice and to mandate a network architecture that does so. It also observed that while the Commission has the authority to forbear, it must make findings that regulation is unnecessary to prevent discrimination or to protect the public interest. The Commission has never done anything of the kind to engage in what it calls a hands-off policy, but what, in effect, is a form of de facto forbearance. In the meantime, hundreds of Internet providers have gone out of business, denied access to the cable modem platform. In these circumstances, I would urge the Court not only to reverse the agency's decision, but to direct the agency that it must enforce the commentary or regulations until such time as, if ever, as it can determine that forbearance is justified. There's been some commentary, I think, with respect to the Neal and some other cases in the Supreme Court, that this very decisive approach makes sense with regard to the Supreme Court because it's a court of last resort, but couldn't necessarily apply to the decisions of the circuits. I think Dick Pearson has made that comment. I'm aware of Professor Pearson's observation. I think the more correct view is the one of the First Circuit, which said that, in fact, the very decisive principle serves an important purpose for the Court, and there is always a backstop of review in bank and, of course, Supreme Court review where the Court has made an error, which it did not make in this case. Thank you, Counsel. Your time has expired. Thank you, Dick. Mr. Butler? May it please the Court, I represent Earthlink. I would like to reserve two minutes for rebuttal. Earthlink has raised three issues for review. The first is the central issue of statutory construction. The second issue goes to whether transmission offered by AOL Time Warner to independent ISPs is private carriage. And the third issue has to do with the Commission's waiver of the computer to unbundling rules. I will focus this morning primarily on the first issue, the statutory construction issue. Earthlink and the Commission agree that the Internet access portion of cable modem service is an information service under the Act. The Act itself states that information services, by definition, are delivered via telecommunications. Where Earthlink and the Commission disagree is on the critical question of whether that telecommunications is also a telecommunications service under the Act. In order for telecommunications to also be telecommunications service, that telecommunications must be offered for a fee to the public. What is the classic example of telecommunications service? I suppose there are many classic examples. Give me some examples as to which there's no dispute that everybody agrees that X is telecommunications service. Well, the most longstanding example, of course, is what's called plain old telephone service or POTS, voice service. By the same token, though, data services which have been available, data transmission services which have been available for many, many years are also undeniably telecommunications services. And in fact, until this case, all transmission underlying enhanced or information services that were offered to the public were considered to be telecommunications service or common carrier services. That's based on telephone company cases, though, isn't it? I'm sorry, Your Honor. That's all you're only addressing really telephone company precedents, are you not? Well, most of the cases, yes, Your Honor, arose in that context because those were the only people providing these services. One of the things that Congress recognized, particularly when it made the amendments in 1999, is that cable companies, for example, would be getting into the telecommunications service business, and in the reverse, under the open video system rules, that telephone companies would be getting into the cable business. And in recognition of the fact that some of these traditional distinctions would go away, of course, the last phrase in the definition of telecommunications service is regardless of the facilities used. In applying the test of offered for fee to the public, a couple of facts that I don't think can be disputed. One is that cable companies charge for cable modem service, so it is offered for a fee. The declaratory order itself under review states that millions of people subscribe to cable modem service, so it's clearly offered to the public. And as much as the statute says that information services, of course, the Internet portion of cable modem service is, under the commission's ruling, are by definition offered via telecommunications, and that service is offered for a fee to the public, clearly there is a telecommunications service included in cable modem service. Just to be clear, we do not contend that the entire cable modem service is a telecommunications service, only the telecommunications portion of that service. Are we talking about the last mile, or are we talking about what portion are you alleging is telecommunications service? Well, frankly, Your Honor, I think although the commission's order is not tremendously clear on this point, I think it's fair to say that what the commission intended to talk about was the last mile. And the reason I say that is that the commission did say we're only addressing residential services. Frankly, it is the last mile connection that is the most critical, and that is the connection that is clearly being denied by cable companies today to independent ISPs. The commission, neither below nor before this Court, has even attempted to apply the offered for a fee to the public test to the telecommunications portion of cable modem service. Instead, the commission says the act is ambiguous. But the commission never says which words or phrases are subject to more than one interpretation. Instead, the commission simply jumps to the next stage of its analysis and asserts that it has reasonably interpreted the definition, the term telecommunications service, as requiring a separate or a standalone offering of transmission. And it's only by adding those words to the statute that the commission is able to come up with its desired result. The problem with the commission's approach is that it's not interpretation at all. As I mentioned a moment ago, the only way that they get there is to add words to the statute. Only Congress, not the commission, gets to rewrite the statute. I would like to speak very quickly to the two other issues in the case. The first is the commission's finding that AOL Time Warner provides cable transmission service to Internet service providers on a private carriage basis. If this Court holds that cable modem service includes a telecommunications service, that requires that the commission's private carriage holding be reversed. While it's true that an entity can be a common carrier for some purposes and a private carrier for others, it's equally true that a single service cannot be both private carriage and common carriage at the same time. The final issue that EarthLink has raised goes to the commission's waiver, reported waiver, of the computer tube rules. The commission offered that in the alternative, saying if we're wrong and this is a common carrier service, we waive the computer tube rules. We've made a number of arguments in the brief, but I would point out simply that under the commission's waiver authority, at 47 CFR 1.3, the commission can waive its own regulations in a proper case. That authority does not extend to provisions of the statute. And the computer tube unbundling rules that the commission has purported to waive are simply a restatement of the requirements in sections 201 and 202. So the commission has, in effect, attempted to waive these statutory provisions, but that's beyond the commission's authority. Counsel, you're down to under two minutes. Unless you have any questions, Your Honor. No, no questions. Thank you. Ms. Levine? Did I pronounce that correctly? Yes, Your Honor. May it please the court, I represent the state of California and the California Public Utilities Commission. In Portland, this court got it exactly right when it concluded based on the language, the structure, and the policy of the Communications Act that the principle of common carriage applies, governs cable broadband service just as it does other means of Internet transmission, such as DSL, regardless of the facilities used. The FCC's belief that this principle does not apply to cable broadband service means that millions of customers in California and much of rural Vermont who have no choice but cable broadband service to access the Internet will be at the mercy of an unregulated cable monopoly who can charge whatever it wants on whatever terms and conditions it wants for that access. Is that issue raised in this proceeding? Your Honor, we're arguing that the result of the FCC's order is to abrogate the common carrier provisions of the Act, which would protect customers from being at the mercy of an unregulated monopoly, which the cable modem service provider would be in many, many communities in California and throughout Vermont. Yet those who are fortunate to live in an area where DSL service is offered will enjoy all the consumer protections of common carriage. So the upshot- I'm coming up on that question of is the FCC required as a result of the outcome of this proceeding to either grant or deny essential facilities treatment to the cable network? I mean, this is an essential facilities case, and I mean, this is a case about whether you should be able to use your competitors' facilities or not. It's a case about- That's the principle underlying the case. My question is, is the commission's specific treatment of these cable modem service, whether there's an abrogation of allowing your competitors to use your facilities, that's the ultimate question. But I guess what I'm trying to ask is, is what we decide now going to decide that? No, Your Honor. What you will decide now and what we'd ask you to decide is that legally the transmission service- there's a transmission service component to cable modem service under the statute. In the next case, the FCC- or in the further proceeding, the FCC can determine under the procedures that Congress prescribed whether or not to regulate that service. They have to apply the regulatory forbearance procedure that's set forth in Section 160 of the Act and make very discreet findings before they can forbear from regulating that transmission service with common carriage. Now, in your brief, you talked about an intrastate element. How does that apply here? Well, Your Honor, the FCC has classified cable broadband service as interstate, and that classification is overbroad. The FCC has acknowledged- So what kind of a showing is there in this record which would suggest anything other than that? Instinctively, it would seem to be a perfectly reasonable conclusion for the FCC to make. Well, Your Honor, one of the services that can be offered using cable broadband service is voice, and they note that at Note 38 of their ruling. And we haven't disputed that one must look at where a communication begins and where it ultimately ends, what the FCC calls its end-to-end analysis, in order to determine the jurisdictional nature of a voice call using cable broadband service. So under that analysis, if, for example, I'm in Seattle and I call my mother in Spokane, and I use my cable broadband service, that is an intrastate call under the FCC's end-to-end jurisdictional act. I'm aware of that, but my question is, what is in the record of this proceeding which raises that issue? Is there, for example, one of the parties to this proceeding in the business of offering such a service on an intrastate basis? Your Honor, what the FCC has done is it has classified, without exception, all cable broadband services interstate, Don't you still have the opportunity to come in and say, oh, by the way, this new company is about to offer this cable modem service on an intrastate basis? Well, Your Honor, we would have to assume by the FCC's silence that they had not intended to include voice communications as one of the services that would be included in cable broadband service. But as I said, they note at Note 38 that voice is one of the services that can be provided over cable broadband. The issues that the FCC has left for further inquiry are those that deal with the effect of its legal classification and what effect it would have on cities and counties over matters like rights of way or franchise fees. But the FCC is not reconsidering the common carrier jurisdictional issues and they have swept voice calls into their legal classification and thereby taken away the authority of the state to treat an intrastate call using cable broadband service as common carrier with all the protections that go with it. The FCC's classification also nullifies key portions of Section 706 of the Act. The FCC does not dispute that the definition of telecommunications capability in Section 706C includes cable broadband transmission, but it ignores language in Section 706A in which Congress directs the FCC to promote advanced telecommunications capability by price cap regulation, regulatory forbearance, or other regulating methods. Now these methods, price cap regulation, regulatory forbearance, pertain only to the provision of telecommunications services, which conceivably, excuse me, if advanced telecommunications service capability includes cable broadband service, it conceivably does, and that's not a telecommunications service, then these regulating methods pertain to nothing. And given that the FCC has tentatively ruled that DSL service should be classified by cable broadband, nothing whatsoever will be left of 706A of the Act. The last point I'd like to make is that despite what the FCC says, consumers are receiving transmission service. We've put in our unopposed request for judicial notice that the offering by cable, they offer a pipeline service that suggests transport, and the key or only variable in the standardized packages that they offer is transmission speed with varying transmission prices. That's clearly evidence that customers are buying transmission service. All right. Thank you, counsel. Your time has expired. Mr. Polner, please. Good morning. I'm pleased to report my name is Frederick Polner. I'm counsel to five townships in the state of Pennsylvania. I'm here today because the rights of my client have been trampled in at least three ways. First, the rights under the Administrative Procedure Act have been wholly disregarded. Second, the FCC went beyond its statutory authority. And third, the FCC action is founded on the Commerce Clause, which must yield to the rights of my Pennsylvania clients to control their local dirt, which predates the Constitution and have not been delegated to the federal government. With regard to the APA, the FCC action is not an interpretive rule. It's a legislative rule. The FCC action sets in stone a foundation upon which an entire regulatory framework is to rest. This is exactly the scenario this court admonishes in Algaraz v. Block. To justify its action, the FCC says it is merely exercising its gap-filling policy. But according to Shavlin, such gap-filling is legislative, not interpretive. The notice of inquiry did not give my clients adequate notice and an opportunity to comment. As this court so aptly stated, a decision made without notice and comment is arbitrary or an abuse of discretion. Moving to the second point, the record before the FCC shows cable modem service runs on the cable television infrastructure. Yet, the FCC finds it is not cable service. Now, in trying to sort all this out, the FCC says... Well, let me ask you a hypothetical question. Suppose there is someone in Portland, Oregon who subscribes to Comcast's offering roughly $100 a month, $50 for cable, $50 for Internet access. What are we talking about in this proceeding? It's just the Internet access part, right? No. Okay. No. The grounding of our concern is really the FCC has removed from Section 621B, which says that a cable operator must... to provide cable service requires a franchise from a local government. These are my clients, the local governments in Pennsylvania. By removing the word cable service, by taking cable modem service and removing it from cable service, they have contravened, the FCC has contravened the will of Congress, which clearly says... Physically, is it possible to have cable modem service without cable service? Well, it runs on the physical infrastructure. That's what prompted the question. Let me see if I can clarify it this way. Our concern is management of the rights-of-way, and management of the rights-of-way are two-fold. Not only is the physical management of the rights-of-way, which I believe is what you are alluding to, but it also includes the fiscal management of the rights-of-way. So, depending upon what is in our rights-of-way, we should have the right under Pennsylvania law, and it's clear in my brief, Your Honor, that we have the right to charge rent. How we charge rent is part of our fiscal responsibility. So, it's the physical management of the rights-of-way and the fiscal management of the rights-of-way to which we are concerned. So, by the FCC removing cable modem service from the definition of cable service, they have removed our federal right under 621B to manage our rights-of-way. Now, your contention is that that is a direct holding in this case, or is it by implication what follows from the FCC rulemaking? I believe it's clear that they said it's not cable service. Therefore, when you read 621B, it's not cable service. We don't have the money for a franchise. It seems to me all you're really talking about is what the franchise fee ought to be. No, it's not only the franchise fee. It's both the physical and fiscal management of the rights-of-way. And in the Notice of Proposed Rulemaking, which is the part to follow, we start with the given. The definition is a given. So, the definition is not an issue in the Notice of Proposed Rulemaking. So, my only opportunity to bring this to the attention of the court to seek relief from my client is right here. The definition covers interactive functions that are performed by cable modem service. Isn't that the problem you have with the FCC's decision? Well, actually, Your Honor, that would be discussed by my colleague, Mr. Lay, who actually follows me. My concern was bringing to the court's attention the rights-of-way issue, which wasn't discussed even in the City of Portland case. But physically, just to be sure I understand your point, nothing changes physically in the sense that the cable is still out in the right-of-way on poles, presumably. Right. The only question is from a financial standpoint or a taxing standpoint, let's say, franchise fee standpoint, the computation of what fees can be paid to the city is going to have to be adjusted because less than 100% of that cable is subject to city franchise. Am I of that understanding? Yes. That is correct, Your Honor. It's both the physical and the fiscal management that we're concerned about. Okay. But you agree that the physical aspects are really not directly involved in this case. In other words, nothing happens. Well, management of the rights-of-ways, which Congress said in 6.1b and also 253c, where they preserve the right of the local governments to manage the rights-of-ways, encompasses both the physical and the fiscal. Yeah, but I'm just trying to get a practical sense. If this rule becomes final, that doesn't mean that the industry is going to have to tear down existing cable that's been raised from… No, actually… It doesn't matter. It's a computation issue. Yes. All right. Great. Thank you. Mr. Lay? May it please the Court, I'm Tillman Lay. I represent Petitioners National League of Cities et al. in this case. I'd like to reserve one minute of my six minutes for rebuttal. Our position differs quite significantly from most of the other petitioners in this case. We agree with the SEC's conclusion that cable modem service is an information service, but we strenuously disagree with the SEC's conclusion that that service is not also a cable service. Our briefs explain in detail why I believe that is true, that the only way to make all the pieces fit, and the pieces include not only the statutory definitional language, the 84 and 96 legislative history, other provisions of the Cable Act, the Internet Tax Freedom Act, as well as the SEC's own discussion of the control issue in its prior AOL-Simon Warner decision and its treatment of the issue in its further notice of rulemaking that was attached to this declaratory ruling. The only way to make all of these pieces fit together is to conclude that cable modem service is a cable service. To reach a contrary conclusion, you basically have to throw some of those pieces out because they just don't fit in the puzzle unless you do that. In my limited time, I'd like to make a couple of points here in two areas, one dealing with the merits of the cable service argument and the second area dealing with this Court's prior decision in AT&T v. Portland. On the cable service issue, the first point I'd like to make is just highlight the 96 conference report which amended the cable service definition to add or use in the upstream half of the definition in 522.6b. There in the joint conference report, which is the most reliable and strongest form of legislative history, the conferees stated pretty clearly what they thought they were doing. The conferees intend the amendment to reflect the evolution of cable to include interactive services such as game channels and information services made available to subscribers by a cable operator. So I think it's pretty clear what Congress thought it was doing in 96. Then the question becomes, well, did it succeed in the language that it used? I believe, again, that it very clearly did. The FCC, on the other hand, their construction of the term basically has to ignore the conference report. But more than that, the FCC can give no meaning whatsoever to the 96 amendment to the cable service definition. It never happened and Congress never did it. There's no reasoned explanation whatsoever as to what in the world Congress thought it was doing when it did that. The second area I wanted to touch briefly on is one-way transmission. There's a lot of discussion on that. Given my limited time, I just want to stress that one way to construe one-way transmission is, of course, to say that the service is predominantly downstream to providers. That is, it provides information predominantly downstream to subscribers. I'd like to note that cable modem service does precisely that. It is designed and it is marketed as a service with much more downstream capacity than upstream capacity. In fact, it's not designed to be a service where the residential subscriber uploads lots of information or sends lots of information up over the service. The area of Portland, this Court's prior decision in Portland, I think there are two reasons it doesn't apply here. The first reason has to do with the Supreme Court's decision in Gulf Power where all eight justices agreed, even though this Court's decision in Portland was in front of them and urged to be followed, that the eight justices decided it was an open decision, an open question, the classification was, to be decided actually in this proceeding that we're doing now. The question I have is, while the Supreme Court wasn't bound by Portland, is our court bound by Portland? I would suggest to you not for the following reason. After this Court's decision in Portland and confronted with this Court's decision in Portland, the Supreme Court said, we think the classification issue is open. All eight justices agreed on that. Of course it was open for the Supreme Court, but why aren't we bound by our circuit precedent here? They declared it was an open question. The SEC had an act that they noted then. But what does that have to do with our circuit law? It has to do as follows, Your Honor, in two respects. First of all, the Court viewed it as an open question to be decided in this proceeding that happens to be the subject of this appeal. And this Court has held in prior cases, and I can give you a couple of sites, that were an intervening Supreme Court decision cast doubt on its decisions that a panel can reconsider. The ones I'd refer you to are Levick v. Skaggs Company, 701 F. 2nd, 777, and Piedmont Label Company v. Sun Garden Packing Company, 598 F. 2nd, 491. I'd note that those are not two cases where the Supreme Court squarely held and overruled this Court's decision. It's just that the analysis was inconsistent. And to me there's a tension with the eight justices saying this is an open question to be decided in this proceeding on the one hand, and on the other hand saying, well, no, it's not really an open question. It's already decided by a prior panel decision of this Court, of which the Supreme Court was aware and declined to follow. There's a definite, I think, tension between those two positions. The final reason that I think... The Court should have concerned itself with the Ninth Circuit's internal rules with regard to precedence? Well, I suspect the... That's unlikely to happen, isn't it? Well, they probably weren't thinking about where the appeal of what they construed to be an open question would end up. That is probably true, Your Honor. They didn't specifically think about that. But they were not... They were urged to actually follow this Court's decision, not only by the Respondents in Gulf Power, but by two Petitioners you have in front of you here today who were amici in Gulf Power, and that is Media Access Project and IRPA. And they declined to make a conclusion. They just didn't reach the question? They declined to reach the question? Well, they didn't reach it, but they also thought it would be an open question that would be decided in the very proceeding we are appealing from right here. I take your point. And then the final point... We're reserving time. Yes, that's correct. Yes, and the only final point I would make is the other distinction is the Schanery Doctrine, which, of course, is entitled to just as much starry, decisive respect as this Court's prior decision in Portland. And under Schanery, the SEC's decision on the cable service issue rises or falls on its analysis of the cable service issue, not this Court's. Thank you, counsel. Thank you very much. Mr. McBride? Thank you, Your Honor. May it please the Court, Andrew McBride on behalf of the Verizon Petitioners. Verizon does not disagree with the FCC or dispute its authority to classify broadband Internet access as a Title I service subject to a minimal regulatory regime. In fact, we feel that's appropriate in a competitive market like this one. Verizon submits that the order under review is unlawful because, without any explanation, it left in place and perpetuated a discriminatory regime that violates both the Communications Act and the First Amendment. Are you talking about DSL? Yes. Well, I thought there was a separate proceeding underway. In fact, isn't it underway as we speak? There is a separate proceeding, entirely discretionary rulemaking proceeding, and our point is that this issue is encompassed within the NOI. The Commission specifically asked for comment on this competitive market and how the players related and how the classification of one would relate to the other, and then it ignored our comments that it would violate the Act and the First Amendment to treat us differently. But surely they're not barred from addressing these issues in the current proceeding, are they? We're not barred, but our point is the FCC can't just – and I think the City of Portland makes this point for us in the sense that it says It relies on the competitively neutral definition in 706 when it arrives at equal treatment, in that case telecommunications service, component of each service. And our point is the Commission, while it has broad discretion to organize its proceedings, it can't ignore an argument that the regulatory course it selects violates the statute and the Constitution. And the First Amendment issues here are quite significant, and I think Judge Cudahy hit it right on the head, essential facilities. How can you possibly unbundle and force common carriage on the secondary player in a competitive market? One looks at Turner 1 and Turner 2. They impose a must-carry regime on cable operators based on the fact that they were dominant and they had what Justice Kennedy referred to in both opinions as bottleneck market control. We have less than 30 percent of the market. The cable operators have 70 percent of a competitive market. How can you possibly justify, without explanation, unbundling the lesser player in a competitive market? It makes no sense at all. And our point is not that this Court need decide those issues, but that we had them right. We raised them in our comments. They were within the NOI. They were clearly offered for comment, and the Commission ignored us. If this Court were to hold that the Commission could simply ignore an argument properly raised in this proceeding that it violated the statute and the First Amendment, the APA would be gutted. The Commission could always point to subsequent proceedings and say, well, they may address the issue. And the example that occurred to me was if the Commission relaxed all cross-ownership rules for the ABC television network in one docket, and then it said, well, and NBC came in and said, we argued they couldn't do that, that it violated the First Amendment and the Communications Act to have a differential treatment of services that obviously compete in the same market. And then the Commission came in and said to this Court, well, we're going to address NBC and CBS in a separate proceeding. That would not fly, and it shouldn't fly here, because the discrimination is ongoing, and it goes on every day. We have to act as a common carrier, carry any message that comes forward. The cable operators are allowed to operate with their editorial discretion in a fundamentally different manner. It operates, in essence, as a ban on Verizon exercising editorial discretion. And the Commission has recognized repeatedly, as has the D.C. Circuit in the USTA versus FTC case, that these services compete, they offer the same functionalities to consumers, and Verizon has the plans to not just the telephone company, not just the transmission part, but Verizon Internet Services doing business as Verizon.net. We offer the same content as the cable operators. We have a home page, sports, music, anything you want, essentially the same broadband facilities. And yet we're forced to unbundle and allow anyone to speak on our platform, and the cable operators are not. The Commission owned, and that seems to be relying on history to some extent. We all see the telephone companies as common carriers, and we can do that until we decide not to, which may be the next proceeding, but we don't really have to undo history in this proceeding. Two points, if I could, Your Honor. It didn't say that in the order. It said nothing in the order. It didn't explain it at all. In the brief, they may rely, and actually they don't rely on history. Others do. Secondly, the 96th Act eliminates history, and that was the point that was made earlier. It says technological neutrality. If we provide cable service, we're subject to Title VI, like the cable companies. If they provide telecommunications service, they're subject to Title II. If we both provide an information service with editorial content, we have to be treated in the same manner. And we don't ask this Court to decide those issues in the first instance, but we say that it violates the APA and the statute for the Commission not to say anything about them in this order. Thank you. Counsel, in the ruling itself, you said there was the SEC ignored this issue. I can't put my finger on it, but wasn't there some reference in the ruling to the fact that there was going to be this separate rulemaking? There was a reference to the separate proceeding, but our point is they had to at least explain why they left the disparity in place, Your Honor. This cable modem decision was rendered a year ago, and there's no – so for one year, if we're suffering competitive injury in a competitive market, and First Amendment injury with no redress, the only body that can at least force the FCC to comply with the APA and address our arguments is this Court. Thank you. I gather since the issue of the First Amendment has not been raised by an oral argument, I assume that counsel is resting on their arguments in the briefs on that issue. All right. We'll hear from the FCC. If it pleases the Court, my name is John Rogobin, and I represent the FCC. With the Court's permission, I'll address three issues. The first is why the Portland case did not control here. Mr. Rogobin, I also show Mr. Carr is listed. Will you be sharing time with him? Yes, I will, Your Honor. He'll cover two minutes. How will you allocate your 35 minutes? We'd like to have 20 minutes for this portion, 10 for Mr. Carr, who will address the regulatory parity issues that you just heard about, as well as the cable service argument. And then we have asked Mr. Simons, on behalf of the cable industry, if he would be willing to speak for five minutes about any remaining issues. That's fine. I just wanted to get an idea of how you wanted to use your time. You control your time entirely, but if your best-made plans do not materialize and people eat into other people's time, the total amount is still 35 minutes. Thank you. We'll hear from the Court's assistance. The first issue, as I said, is why Portland does not control here. The second issue is why it was reasonable for the FCC to determine cable modem was an information service and did not have a separate telecommunications service. And then the third issue is why the Computer II doctrine does not compel a different result in this case. The Portland case, as I mentioned, is not controlling for the simple reason that there was no occasion for the prior panel to address the question here. The question presented here is whether the FCC was reasonable in its interpretation of an ambiguous statute. And here, unlike in Portland, the appropriate analysis is the Chevron analysis, and the Portland case went out of its way to say that this was not a Chevron case, precisely because there was no prior agency decision. Well, now, from the standpoint of the FCC, what should the applicability of Portland be? I understand your argument with respect to interpreting Portland from the standpoint of our Court, but from the standpoint of your agency, now that your agency has experienced this specific holding, what does it do in terms of your limitations? Your Honor, I think the Commission obviously read the Portland decision, looked at the analysis, considered the ambiguities of the statutory term telecommunications service, considered the different interpretations that might be available. Obviously, the Portland panel has one interpretation of how cable modem service should be interpreted. And then the Commission brought to bear its policy judgments, its analytical and reasoning to the statutory ambiguity. But you don't feel bound as a matter of law? No, Your Honor. And probably the simplest reason is that the Portland panel had no occasion to determine whether the statute had a clear meaning, and that is the probably most important thing. Where do we find that exactly in Portland? You said that the Portland panel said that the statute was ambiguous. Where do we say that in Portland? Judge Thomas, it doesn't say that on the face of the opinion, but it's certainly our reading on the four corners of the opinion that there did not appear to be a resolution of the clear meaning of the statutory term. I wouldn't purport to tell, Your Honor, what you had in mind as you were considering that issue. But as we read the opinion, it certainly doesn't appear that there was a clear meaning in the same way that the Supreme Court has used that phrase in the Lechmere, Mazelin and Neal line of cases. And I think that makes a lot of sense. And if for no other reason you can look at the positions of the parties here, I think they have various views of what the right results should be. I think the other courts of appeals that have addressed this issue have come out differently. The Eleventh Circuit in the Gulf Power case below came out differently from the prior. I recognize that, but how do you get around a Mesa Verde analysis, which basically is that if our court has engaged in statutory interpretation and there's a subsequent agency decision, that we aren't free to reinterpret the statute and lie to the agency decision unless we were – our prior interpretation is based on deference. And as you've noted, it clearly wasn't in Portland. Well, Your Honor, I think the Mesa Verde case supports the analysis here. But probably the most important thing to recognize in terms of Ninth Circuit law is that the Ninth Circuit has never had a case quite like this, where there was a prior resolution by the court but no agency determination, and then you had a later agency determination. What about LATFA versus – or LATFA versus INS, which we said we do not – we do not exclusively apply principles of deference to questions already controlled by circuit precedent because a panel may not reconsider the correctness of an earlier panel's decision. Well, as I understand the LATA case, it appeared that the agency was acting in a way that was contrary to its own regulations. And there was some statutory reasoning in the case, but I think for that reason it's not controlling here. I think far more instructive is the Eleventh Circuit's decision in the satellite broadcasting case. That's exactly like this case. And the court there, Judge Kravich, had a very well-reasoned opinion in which she assessed what the right result here is, and it really turned on whether there was a prior clear meaning. And the Second Circuit case, Shizzler by Judge Winter, was also squarely on point. Well, that was a footnote case, wasn't it? Yeah, I think far more instructive for this court would be to read the satellite broadcasting case in the Eleventh Circuit. Now, that's about the only precedent you've got, I think, on this point. Well, I think it was Judge O'Scanlan who may have mentioned tax cases, the Redlar case, which is a Ninth Circuit case. I think it's very instructive here. How about the Neal case in the Supreme Court? How do you deal with that? I don't read the Neal case as changing the substantive standard, which is whether there was a clear meaning determination. I know the petitioners have made much of the fact that the word clear doesn't appear in that discussion, but I think it would be excessively ironic if the Supreme Court, in a stare decisis case, hadn't followed the prior decisions of the court, which said very clearly that clear meaning is the touchstone. And, again, I... Are you saying that any time we don't use the word clear meaning in Virginia statutory construction, we don't use the phrase clear meaning as a subject to review by a subsequent panel? No, Your Honor. I don't think that's the touchstone that the Supreme Court has identified. I don't think the words clear meaning have to show up in the panel opinion, but I think that has to be the gist of it. And by clear meaning, we really, in an agency context, we're really talking about whether this is a Chevron step one case, whether there was one and only one determination of the statute. And I would respectfully argue that there just simply is not one and only one interpretation of the words, of the phrase telecommunications service. And I think maybe this is a good time to move to the... Well, I just wonder if this isn't a curious byproduct of the MDL application here. I gather under 2112, where there are multiple appeals of an FCC ruling, the MDL panel has to randomly assign it. So suppose this went to the Third Circuit, which presumably has no authority whatsoever. In that situation, just by the luck of the draw, there would not be any controlling precedent issue. Is that... That's right, Your Honor, which I think would lead to some of the bizarre results that the petitioners are advocating here in their theory of how to look at this case. I think if it had gone to the Third Circuit or the D.C. Circuit, they would not have been bound by the Portland case and would have addressed this as a standard Chevron review case. I think if the Ninth Circuit en banc were to review this case, I think they would review it likewise as a standard Chevron case. Do you have any cases on the multidistrict aspect of this proceeding? The only one I could find was out of the D.C. Circuit, and in that multidistrict litigation, that was one of the NDRC cases out of the 80s, they applied their own prior precedence that it controlled even though it was a multijurisdictional case. Your Honor, I'm not familiar with that. I'm just wondering if you have any cases. That's the only one I could find. Your Honor, I'm not familiar with that, but I don't think that the Court needs to look beyond the Supreme Court decisions in Chevron as well as the Mesa Verde case, which I think some of the same principles discuss about not wanting to impair an agency from coming up with a national rule. I think apply here. I think the Eleventh Circuit noted those, and rightly so. There was some discussion of the Gulf Power case, and there is Ninth Circuit precedent that does hold that where there has been an intervening Supreme Court case that undermines something that happened before, that can be taken account of. Obviously, the Supreme Court didn't address the specific question here, but did seem to suggest that it was an open question. So I don't think that the Court needs to look beyond the Mesa Verde case, Redlark, the controlling Supreme Court decisions. And let me give you a segue. Assuming we agree with you, then tell us why we shouldn't follow the logic of Portland. The second issue is why there was no separate television. One last question on Portland. Suppose Portland said explicitly there is only one possible meaning that can be defined from this section, and then it goes back, or then you have your rulemaking. Would you argue the SEC is still free to ignore one circuit's interpretation in the light of its own policy considerations, et cetera? Your Honor, from my vantage point, thankfully, we don't have that situation to confront. But I do think that Professor Pierce – I'm sorry. I was giving you a hypothetical. I agree with you. That's not precisely what – Right. But I think Professor Pierce's point that Judge Cuddy, he noted that that kind of, you know, establishing the, you know, the broad holdings in interpreting a statute, I think is, you know, is a very good point that Professor Pierce has, that that's really a role best left for the Supreme Court. But it would certainly be a different case. We're very happy to act independent of the Supreme Court whenever we can. Well, just one last point on that. I mean, I do think it would be a bizarre result if, you know, the panel were – a position that we know the en banc court and the Supreme Court would not take. They would not take the position that the Portland– Right. I totally agree. Back to the segue. Excuse me. The SEC's reading of the Act was plainly reasonable. The main holding by the SEC was that this was an information service, and I think there's no real dispute about that. That's the easy part of the case, because there is the mixing together of computer functionality as well as the broadband type. And from the perspective of the end user, there are two points to make. One is that the end user is getting classic information service. And the second point is that they're getting one service, paying for one service from the cable operator. Am I reading the decision correctly in the – But am I reading the decision correctly that the SEC position is that even if pure transmission services are provided and only transmission services, and a fee is charged purely for transmission services, sort of a bring-your-own-access plan, that that – the transmission services are information services? I think if, Your Honor, you're referring to the portion of the opinion about the private carriage between AOL, Time Warner, and ISPs, that was the – I think that was really the only part in the SEC's decision where they were addressing what would happen if they were just selling transmission. And it was that portion of the decision around paragraphs 52 to 54 where they're really addressing what happens if just the transmission is sold. I'm actually looking earlier in the decision, and I may not have it at hand, but around in the 20s, paragraph 20s, where the various business models are described. And then the conclusion is that they're all information services, as I read it. And that's my question, is that maybe I'm over-reading what it says, but there are, of course, services. There aren't very many, but there are services that offer pure transmission for a fee. And my question to you is, is the SEC – does the SEC decision mean that when a cable operator offers pure transmission for a fee without providing an ISP on its own, is that an information service? Your Honor, I believe that portion of the opinion, if I'm understanding you correctly, the SEC says we don't know for sure because we don't have a keen enough sense of what's going on, but we do know that the contractual relationships are in the nature of private carriage. What is the SEC's position on that question? That we've asked for further commentary, and that's part of one of the questions that's been left open for the next proceeding in the open access portion of the proceeding, which is come tell us about what happens in that relationship between the cable operator and the ISP. But the commission said it may well be telecommunications, but didn't say for sure what it was. And so that question has been left open. It was not resolved definitively. What was resolved definitively is that it was private carriage as opposed to common carriage. I'm actually not thinking about that portion of the opinion, but go ahead with your argument. So there are three main problems that the SEC identified in terms of finding a separate telecommunications service. You have to find a separate telecommunications service in the first place, and that's the issue, isn't it? No, Your Honor. It went the way it did because it didn't find a separate service. But the petitioners here say you don't have to find a separate service. Isn't that the issue? They have two arguments. One is straight up on the statute. Does the statute compel this result that there is also a telecommunications service? And I say, well, look, even if we're not right about that, the second is the computer, too, and whether computer two forces there to be a separate service made available. And I think we should take them one at a time. The first is the statutory. Isn't the predominant value of the service in the speed, the broadband, the speed of the interchangeability of the service, or the ability to use your computer and rapidly get rapid answers to the questions? And isn't that really a feature of the telecommunications aspect more than anything else? Your Honor, that's a feature of a lot of things. It's the feature of the fact that there's a big pipe, which is in, as the FCC determined, was the path that was being used to deliver the information service. It's also a feature of all the computer functionality that's offered and gets mixed in for the service. But the main reason that the FCC determined the way it did is that it has, for a long time, taken the position that a service is either an information service or a telecommunications service, but it's not both. And that was laid out in the report to Congress in 1998 and dates back quite some time. But that report to Congress was where it was most explicitly stated. So that is a reason why, although the Portland panel's interpretation, you know, in our judgment, may well have been another reasonable interpretation, but it would have been an unlikely one for the FCC because it has said for some time that the two are mutually exclusive. And it has said that the provision of the telecommunications service has to be a stand-alone service, precisely because of the congressional statutory term, which it keys off of whether it's provided to the public, whether telecommunications is provided directly to the public. And, you know, again, it may well be that there are different ways to think about it. If there was a regulation about the sale of butter, the question might come up was, well, you know, does this cover somebody who's also selling cakes? You know, cakes have butter in them, and if I sell a cake to the public, am I also selling butter directly to the public as opposed to selling just a stick of butter? And, you know, it may well be that those are acceptable and reasonable interpretations to take either of those. But the FCC did not. It did not for the reasons that I've stated about there being separate services. And that's been around for quite some time. So using that paradigm, do you think it is likely that the FCC is going to hold that a pure transmission service is a telecommunications service? With respect to the open issue that's left before the commission? Yes. I just don't know. I mean, there may well be other ways. That was enough for a question, but that would set the paradigm you're talking about, right? Well, it could be. It could be that what's private carriage for various reasons is converted to common carriage. I mean, there are lots of different results that could happen in this open access piece, and the commission could use its Title II authority or Title I authority, but we just don't know. That is an open proceeding and really relates to, I think, the core of what the ISPs want here. They want open access. And interestingly, part of what their argument is all about is I think they really want their take needed too. I mean, they don't want to be under the same typology here. They want to be in a position where just facilities-based providers of information service are providing two services, but to the extent they buy and are providing an information service, they want it only to be an information service. And I think that disparity between the two certainly undermines their positions. Counselor, you're down to about 15 minutes. I just alert you to your plan. Thank you, Your Honor. The second point that I thought is important to address, and Judge Cudahy really was getting at, I think, an issue you raised about Computer II, is that the petitioner's claim, look, even if the statute does not on its own scheme require the cable modem also includes a telecom service, they say this Computer II regime that the commission has had for quite some time comes to bear here, and that's another take on how you might force open access here. And the commission, I think, was quite reasonable in not applying the extraordinary measures of this Computer II regime, and it was, I think, Judge Cudahy or Judge Scanlon mentioned that was really all about the telephone plant, and that's really the main reason why. Based essentially on history, is it? I mean, the telephone companies have always been counter-carriers. That's right. The issue now is whether we go with the function or with history, isn't it, with regard to the IFPs? Well, I think look at- In function, maybe they ought to be treated the same way. Well, I think that it's important to keep in mind that the extraordinary remedies of Computer II that the commission developed were really because of all the bottleneck control and the incentive and opportunity to cross-subsidize, and there were very extensive findings backed up by a very extensive record, which was developed over the course of several years in the 70s leading up to the Computer II decision, that really support what was going on there. And just to keep it in mind, what the Computer II regime required is that a telephone company, and we were not talking about AT&T that had a separate structural separation requirement, but these telephone companies had to buy services that they would use in the adjacent market for enhanced services. They had to buy out of their own tariffs, and that was to ensure that they would be on a level playing field with the other providers of enhanced services. And that made all the sense in the world, but when you try and apply that here, it just doesn't work. There is no tariff that the cable operators have, and they're not common carriers. So this Computer II regime just simply doesn't match up. I'd like to briefly address the interstate point that California raised, and the commission held in its order that the information service was interstate for jurisdictional purposes, and they relied on the end-to-end analysis that we've discussed. And that analysis has repeatedly been upheld in the D.C. Circuit and was recently referred to in a Ninth Circuit case, Pack Bell, which we submitted to the court through a 28-J letter, and they seem to go along with this jurisdictional analysis, which I think makes all the sense in the world here. I believe Ms. Levine was referring to IP telephony in her discussion that she had with the court, and that's simply not an issue that the FCC got into in its order. Commissioner Pops made clear in his dissent that we were not getting into IP telephony. We also didn't get into the role of the state. I suggested that you should have. Isn't that part of the problem? Well, we specifically asked in the further notice portion of the order for further commentary on what the right role of the states ought to be and whether they should be preempted or not. These are very serious issues, and the commission wanted to hear more about it. So we simply just did not get into that issue. And, Your Honor, those are the main points that I wanted to raise with the court. If there are any other questions about any aspect of the court's order or discussion of the Portland case, I'd be happy to address it. We will hear from your colleagues, starting with Mr. Carr. Thank you very much. Thank you, Counsel. Thank you. May it please the Court, my name is James Carr. I represent the Federal Communications Commission, and I'd like to start by discussing the cable service arguments that have been raised by the National League of Cities and the Pennsylvania townships in this proceeding. First, I'd like to start with the city's argument that the definition of cable service is somehow clear and clearly shows here that the FTC should have designated cable modem service as a cable service. Counsel, are the cities accurate in their conclusion that there is a financial impact on them by this classification that we're engaged in? Okay, we'll start with that then, with the township issue. We've made it clear in our brief and in the order on review in the notice of proposed rulemaking that issues about rights of way and franchise fees and the impact of this classification on those issues are still open issues before the FCC. So, I think it's premature for the townships to be making this argument, and indeed they agree in their reply brief that nothing that the FCC has done here has actually directly affected the municipal government's ability to regulate their rights of way at this point, either through the physical regulation or at this point through the franchise fees. Now, it is true that by saying that this is not a cable service, they cannot use, when they're calculating cable franchise fees, they cannot use the cable modem revenues as part of their calculation of the cable franchise. There's still an open question, though, before the FCC. Could we turn it around and increase the franchise fees on the other portion of the service? In other words, on the pure cable service? Right. There's a statutory limit in terms of how much they can charge. I believe it is five percent of the revenues that are accrued through the provision of cable service. So, that's really where the issue is here. But the commission has made clear that it's left that issue open. The townships are in a position now where if someone orders a pure cable modem service and does not subscribe to a cable broadcasting service, that there is no fee assessed. No, they can't assess a fee under this decision. Why do you say that's an open question? Pardon me, Your Honor, I'm sorry. There's still an issue as to whether there might be other authority for them to impose franchise fees. Right, but this is the case for them to raise in that issue. I mean, you kind of suggested that we don't reach the issue because it's an open question, and I'm not sure quite how I understand that as to pure cable modem service and the ability of the cities to impose a franchise fee on it. Well, my understanding of the issues with respect to excess of statutory authority and constitutionality under the Tenth Amendment, they're really talking about the physical management of rights of way. And those issues clearly are still before the FTC. And there's some indication even in the record that the provision of cable modem service really doesn't have that much of a differential impact on the rights of way if a cable operator is already providing cable service through its infrastructure. Right, but that's the problem. When you're talking about the provision of new cable modem only service, then it does impact rights of way and it does impact franchise fees. And those are issues that are affected by your decision. Well, I would argue that with respect to the physical management of rights of way, that's still an open question. As for franchise fees, they cannot charge them through cable service fees, but there may be- a portion of all users would subscribe to cable modem service only as opposed to cable and cable modem. I'm not aware of that, Your Honor. Perhaps our intervener could address that if he gets an opportunity. I see my time is running short. Mr. Simons has traveled a long way. I'd like to mention with respect to the notice point. As a practical matter, I don't really believe that any parties raised this issue before the FCC. In their reply brief, the townships point to some comments from various parties that no party argued before the FCC that if it addressed this classification issue without seeking further notice and additional opportunity for comment, it would be violating the Administrative Procedure Act. I don't believe that the Commission violated the APA in any event because it gave clear notice in the notice of inquiry that it was considering these classification issues. Indeed, in paragraph 23 of the notice of inquiry, it specifically asked whether it should consider this service as just an information service. The parties submitted extensive comments. They had full opportunity to comment, and that's really all that the APA requires. As for the city's argument with respect to the clarity of the cable service definition, almost 10 years ago in the video dial tone case that the D.C. Circuit decided, NCTA versus FCC, that court found that the definition of cable service was unclear and that the FCC reasonably construed the phrase one-way transmission in that statute to mean that the cable operator must actively participate in the selection and distribution of programming services. It did not do so in the video dial tone provider did not do so in that context, and we believe the provider of cable modem service also does not actively participate in the selection and distribution of content here. It's really the subscriber who is controlling the experience and who is deciding what information flows over the wires. And that's the most important part of that particular definition. It's really the only indispensable part. You'll notice that the statute refers to subscriber interaction, if any. It's not even an indispensable part of cable service, whereas one-way transmission, which we have interpreted to mean active participation of cable service providers in the selection of content, that's critical to the definition of cable service. So it was reasonable for the FCC to determine that cable modem service was not a cable service. I'd like very briefly to address Verizon's argument. And I'd like to point out that the relief that Verizon is seeking from this court is relief that it is already receiving from the FCC. There is an ongoing proceeding to address precisely the issues that Verizon has raised here. In fact, even before the FCC issued the declaratory ruling on review here, it had issued a notice of proposed rulemaking to address the broadband wireline issues. So it's hard for me to fathom how Verizon can argue that the FCC ignored these arguments. It simply decided that it wanted to decide these issues in a separate proceeding. These are hotly contested issues, as you can tell from a number of the briefs from our supporting intervenors. AT&T and MCI WorldCom greatly dispute the claims of Verizon with respect to regulatory parity. And so the FCC quite reasonably decided that it should look at this issue in phases and decide things one step at a time. The courts have long recognized that agencies have the discretion to control their dockets and to proceed one step at a time when they're dealing with difficult issues. If you have no further questions. If the FCC ends up agreeing with Verizon's position in its regulatory parity assertions in the subsequent proceedings, what happens to this decision? And what modifications would this decision, would the FCC have to make in this decision? In the declaratory ruling, I don't think that it would necessarily have any effect on this declaratory ruling. No, you're right. But you couldn't make a finding inconsistent with this one, could you? We could. We would expect that Verizon would sue us at that point. And if we've agreed with Verizon, we expect someone else will sue us. That's the problem with the idea of deference. And when an agency takes a letter of contract position, it binds the circuit court in a different way. Because there is a shift in position between Computer 2, which we have in front of us in Portland, and this decision, at least there's some tension. You may change your mind, or the agency may change its mind tomorrow. Well, that's true, Your Honor, and that's part of administrative law practice. The key issue is when the agency changes its mind, does it explain itself sufficiently so that the change is reasonable? If the agency does that, then it seems to me it's complying with the administrative procedure. I wasn't suggesting you weren't, except in the area of statutory construction. Sure, sure. But, again, we've already been through this extensively this morning. We find the statute to be ambiguous. Thank you, counsel. We'll give all the remaining one minute and nine seconds to Mr. Simon. May I please the Court? I'm Howard Simons here, representing the National Cable and Telecommunications Association and the Cable Interveners. In the short time I have remaining, I'd just like to address a few points. First, in response to several questions from the panel earlier this morning, Judge Thomas, with respect to your question about bring-your-own-access arrangements made available to retail customers, that does not entail the sale of pure transmission to the end user, to the retail customer. Where you have a bring-your-own-access arrangement, the end user is utilizing the cable modem service to reach an endpoint that happens to be another ISP, rather than, say, Amazon or Yahoo. But, functionally, it's the same thing. You're just going to a different place and obtaining a different service. It's called bring-your-own-access, but it's not a pure transmission service. Why isn't it pure transmission service? In other words, I understand you may characterize it as a business model, as a partnership, a joint venture, but I guess theoretically speaking, if all you're selling the consumer is transmission, my question is why isn't that a telecommunications service? With respect to a sale of service to an end user, the cable operators don't sell just pure transmission service. What they sell is Internet access where you can go anywhere on the Web, including an ISP site. Functionally, it's the same thing as typing in yahoo.com, and instead you're going to an ISP and utilizing their service. But it's not pure transmission any more than the sale of the capability to get to Amazon or the sale of the capability to get to Yahoo is pure transmission. The commission in the report to Congress, paragraph 76, made it clear that that kind of capability, because it involves a retrieval of information, is an information service and not a sale of pure transmission. Same thing for so-called bring your own access. Counsel, you recall a question I had asked about the portion of the market. Can you tell us, with respect to cable operators generally, what portion of their service is offered to Internet only without the direct cable? Most, if not all, cable operators make available cable modem service to non-video customers. I don't have the precise number. It's a very, very small number. It's in the low single-digit percentage. Most people who buy it are also cable video customers. Would that more likely be commercial rather than home users? Most cable modem subscribers today are residential users simply because that's where the architecture of the plant has gone. Most cable operators would serve business areas because they went out to sell video to subscribers in their home. But it is a very small proportion. I took up some of your time, so let me just ask you, what other point did you want to make? Thank you, Leonard. The other point I wanted to make was simply that we're here in support of the ruling because we believe that it's critical to have a uniform national policy that's based on a fuller record than you had in Portland that construes all of the relevant terms at issue that are raised by a review of that fuller record, including the information service, telecommunications versus telecommunications services, matters that were not perhaps as fully explored in the city of Portland case that they might have been given the narrowness of the record before the court in that case. It's not an equal number of briefs. Well, the two-sided comping, to say the truth. Thank you, counsel. Thank you. We will now have some rebuttal. I'm aware of requests for rebuttal time for Mr. Butler and for Mr. Lay. Was there anyone else who would reserve time with the deputy clerk? I had a question. Okay, well, we'll give you your minute. Mr. Butler? At the outset, Judge Scanlon, you had asked at the end of Petitioner's presentation whether there were any further comments with respect to First Amendment. I just wanted to note, as we noted in the letter that we sent to the court last week, that I am prepared to answer questions that may have been raised or that were on issues that were raised on the First Amendment by Consumer Federation. Well, we have your briefs. Right. I just wanted to mention that. Yes, thank you. A couple of very quick points. With respect to this business about there having to be a separate offering, I thought I would find out today where in the statute it says that. I have not. Mr. Rogovin referred to the mutually exclusive language in the Universal Service Report to Congress. Frankly, I've never understood that language, but to the extent I do, I think all it says to me is that information service and telecommunications service are not the same thing. That does not mean that they can't coexist. If telecommunications and information service couldn't coexist, I don't think Congress would have put them together in the definition of information service. I'd like to correct one other thing that Mr. Rogovin said. He said that in the ongoing proceeding, when the Commission decides ultimately how to regulate or not regulate table modem service, that the Commission might use its power under Title II. Well, the Commission's decision in the declaratory order precludes its ability to exercise almost all of the authority in Title II. Title II authority in almost every instance, and we have a list that begins at, I believe, page 12 of our reply brief and runs on for a page and a half. All of those provisions of Title II apply to telecommunications services and telecommunications carriers. If the Commission says that this is not a telecommunications service, it has no power under Title II to regulate the service. Thank you. Thank you, counsel. Mr. Le? Thank you. I'll be very brief. I just have a couple of points. The FCC basically had two points on the cable service issue. Their first position was that the statutory definition is ambiguous. We believe it's not, but it doesn't really matter because even if the statute is ambiguous under Chevron, that doesn't mean the FCC can define it any way it pleases. And the fact of the matter is, I would suggest that it's not reasonable under Chevron Part 2 to write the 96th Amendment out of the Act, to cast aside the 96th legislative history, to cast aside the 84th legislative history, to say Congress didn't know what it was talking about in the Internet Tax Freedom Act and it didn't know what it was talking about in Section 544B. The second issue raised was the suggestion that the critical ingredient that makes a cable modem service not a cable service is because the cable operator does not participate in editorial control over the service. The FCC has found in AOL Time Warner decision two years before this that cable operators do have that power to exercise editorial control over content, and in fact it reaffirmed that conclusion in the notice proposal we're making here. The FCC's argument appears to be that as long as the editor doesn't exercise editorial discretion, it has none. I suppose that means if tomorrow a cable operator decides to block a site, presto, the service becomes a cable service. I would suggest the exercise of the power to exercise is the editorial control that the FCC. Thank you very much. Thank you, Mr. Lane. Mr. McBride? Thank you very much, Your Honor. I don't think I can speak as quickly as Mr. Lane, I'll try. On the history matters point, I think the courts just need to look at the definitions of the Act and the Commission's own statements in its order, and I would point to paragraph 35 of that order where it says, none of the foregoing statutory definitions rest on the type of facilities used. I think that's the key, that we have a change here. We have a different broadband market that has a lot of different players in it. There is no bottleneck. That's what computer two was based on. That's what this court said in California one, California two, and that's not present here. But to relieve the market leader with 70% of market share and leave in place unbundling commentary regulations for the secondary player is ridiculous, and at least it requires explanation in this order. And I point the court to Vermont Yankee and to United States lines out of the D.C. Circuit. True, the agency can organize its own proceedings, but it can't ignore an argument that it's violating its own statute or the Constitution in doing so. They said nothing about our arguments here, even though they were clearly invited in the NOI. I think Judge Thomas raised a key point, which is, what happens? These are inextricably linked, and the court recognized that in the city of Portland. You can't consider one without the other. And what happens if the Commission reaches contrary results? The Commission has to at least explain disparate treatment, and the final point is that treatment is ongoing today, that right now we must serve any comer on our system, even as the lesser player, and there was no explanation for even the temporary maintenance of the discriminatory regime that hurts DSL in this order. No explanation at all. Thank you very much, Judge McBride. The case just argued will be submitted for decision. On behalf of the panel, I would like to commend all counsel for superb presentations in their briefs and in an oral argument today. I'm not sure whether you have made our decision more difficult or easier, but you certainly have elucidated all the relevant considerations, for which we thank you. We will adjourn.
judges: Cudahy , O'scannlain, Thomas